CHATEAU VEGAS WINE, INC., A NEVADA CORPORATION; AND TRANSAT TRADE, INC., A CALIFORNIA CORPORATION, APPELLANTS, v. SOUTHERN WINE AND SPIRITS OF AMERICA, INC., A FLORIDA CORPORATION DBA SOUTHERN WINE AND SPIRITS OF NEVADA; AND MAISONS MARQUES & DOMAINES USA, INC., A DELAWARE CORPORATION, RESPONDENTS.

No. 52977

November 23, 2011                    265 P.3d 680

---

[Rehearing denied April 17, 2012]

*Callister & Frizell* and *R. Duane Frizell*, Las Vegas; *Hutchison & Steffen, LLC*, and *Michael K. Wall*, Las Vegas, for Appellants.

*Lewis & Roca LLP* and *E. Leif Reid*, Reno; *Korshak Kracoff Kong Sugano* and *T.R. Sugano* and *Keith Thorell*, Sacramento, California, for Respondents.

Before the Court EN BANC.[1]

## OPINION

By the Court, SAITTA, C.J.:

In this appeal, we address two primary issues. We first consider whether the district court abused its discretion in permanently enjoining appellants from importing and selling certain Bordeaux wines in Nevada. We conclude that it did not. Next, we address whether the district court abused its discretion in permanently enjoining appellants from importing and selling certain French champagnes in Nevada. We conclude that it did not. We therefore affirm the district court's order granting the permanent injunction.

### FACTS AND PROCEDURAL HISTORY

Appellants Chateau Vegas Wine, Inc., and Transat Trade, Inc., are importers and wholesalers of liquor in Nevada. Similarly, re-

---

[1]THE HONORABLE RON PARRAGUIRRE, Justice, voluntarily recused himself from participation in the decision of this matter.

spondent Southern Wine and Spirits of America, Inc., is an importer and wholesaler of certain Bordeaux wines and French champagnes in Nevada. Respondent Maisons Marques & Domaines USA, Inc. (MM&D), is the United States importer of certain French champagnes and the United States agent of a champagne producer.[2] For many years, Southern Wine has developed and maintained commercial relationships with the producers of the Bordeaux wines and French champagnes. Southern Wine has partnered with the producers, or their agents, to build and market the brands over time and has invested in the success of the brands, including the producers' entire portfolio of wine and champagne. Broadly speaking, the producers, or their agents, have selected Southern Wine to exclusively import the wines and champagnes into Nevada, due to its success in selling various luxury brand name liquors. In addition, the producers, or their agents, have also designated Southern Wine to import and sell the wines and champagnes because of its quality-assurance measures.

## *The Bordeaux wines*

The twelve Bordeaux wines at issue in this case are produced by five châteaux in the Bordeaux region of France. After the wines are produced, the châteaux do not sell them directly to wholesalers or retailers; rather, through brokers known as "courtiers," the châteaux sell to "négociants." The négociants then sell the Bordeaux wines on the international market.

In 2003, Southern Wine entered into agreements with four of the Bordeaux châteaux, in which each château granted Southern Wine the exclusive right to import its wines into Nevada. In 2005, Southern Wine entered into a similar agreement with the fifth château. Each of the five agreements read as follows: "Supplier grants to Southern Wine . . . the exclusive right to import the Products [listed in the agreement] into the State of Nevada and sell and/or distribute the Products within the State." Nevertheless, each agreement states that the châteaux will not sell the Bordeaux wines directly to Southern Wine; instead, Southern Wine must purchase the wines from the négociants identified in each agreement. Each agreement also states an effective period of five years.

Subsequent to entering into the agreements with the châteaux, Southern Wine filed the agreements with the Nevada Department of Taxation (Department). Southern Wine believed that in filing these agreements, the châteaux had designated the négociants as their agents. As a result, Southern Wine was under the impression

---

[2]For ease of reading, appellants Chateau Vegas Wine, Inc., and Transat Trade, Inc., are, at times, collectively referred to as Chateau Vegas, and respondents Southern Wine and Spirits of America, Inc., and Maisons Marques & Domaines USA, Inc., are, at times, collectively referred to as Southern Wine.

that the châteaux did not themselves need to obtain a certificate of compliance or file a designation of importer (DOI)[3] for Southern Wine because the négociants could do so.

Unlike the designation of an importer, the Department does not have a particular process for a supplier to designate an agent.[4] Instead, the Department may learn that an agent is a designated agent when the agent files a certificate of compliance (COC)[5] indicating that it is a designated agent.

Each négociant designated in the agreements filed a DOI with the Department, identifying Southern Wine as its exclusive Nevada importer. Southern Wine signed and dated these DOIs. Each négociant also holds a COC with the Department. Neither the châteaux nor the négociants have filed a DOI with the Department designating Chateau Vegas or Transat Trade as an authorized Nevada importer.

### The French champagnes

Champagne Louis Roederer is the producer of Champagne Louis Roederer products, including Cristal champagne. Champagne Louis Roederer filed a designation of agent (DOA)[6] with the Department, identifying MM&D as its exclusive United States agent of Champagne Louis Roederer products. MM&D has had an exclusive relationship with Southern Wine for approximately 25 years and has filed numerous DOIs with the Department, identifying Southern Wine as its exclusive Nevada importer. MM&D also holds a valid COC with the Department. MM&D does not have a relationship with Chateau Vegas or Transat Trade and has not designated either as an authorized Nevada importer.

Moët & Chandon is the producer of Dom Pérignon champagne. Since 1958, it has designated two companies as its exclusive United States agents. From 1958 to 1987 and from 2004 to the present, Moët & Chandon designated Moët Hennessy (formerly known as Schieffelin & Co.) as its exclusive United States agent. From 1987 to 2004, Moët & Chandon designated Schieffelin & Somerset Company as its exclusive United States agent of Dom

---

[3]Under NRS 369.386(2), a producer of liquor or his or her designated agent must "file with the Department a written notice indicating the name and address of each designated importer," who must then "file with the Department a written acceptance of the designation."

[4]Under NRS 369.150, the Department is responsible for administering the provisions of NRS Chapter 369.

[5]Under NRS 369.430(3), "[b]efore a person may engage in business as a supplier, the person must obtain a certificate of compliance from the Department."

[6]Under NRS 369.386(3), a producer of liquor who designates an agent must file a "written designation indicating the name and address of the agent," who must then "file with the Department a written acceptance of the designation."

Pérignon. In 2002, Moët & Chandon filed a DOA designating Schieffelin & Somerset Company as its agent. In 2008, Moët & Chandon filed a DOA designating Moët Hennessy as its agent. During the relevant time periods that they acted as agents for Moët & Chandon, Moët Hennessy and Schieffelin & Somerset Company held valid COCs with the Department. Both also filed DOIs with the Department, identifying Southern Wine as their exclusive Nevada importer. Neither Moët Hennessy nor Schieffelin & Somerset Company has filed a DOI designating Chateau Vegas or Transat Trade as an authorized Nevada importer of Dom Pérignon.

Veuve Clicquot Ponsardin is the producer of Veuve Clicquot champagne. It designated its wholly owned subsidiary, Clicquot, Inc., as the exclusive United States agent of Veuve Clicquot Ponsardin products, including Veuve Clicquot, and has filed DOAs with the Department to this effect. Since 1999, Clicquot, Inc., has had an exclusive relationship with Southern Wine and has filed DOIs designating Southern Wine as the exclusive Nevada importer of Veuve Clicquot champagne. During this time period, Clicquot, Inc., held a valid COC with the Department. Clicquot, Inc., has not filed a DOI designating Chateau Vegas or Transat Trade as an authorized Nevada importer of Veuve Clicquot.

*Chateau Vegas' and Transat Trade's activities and the commencement of this case*

In 1996, Transat Trade obtained a COC from the Department and began supplying liquor to various Nevada importers. These importers subsequently went out of business. Consequently, Transat Trade became incorporated in California and Chateau Vegas became incorporated in Nevada. Transat Trade then began providing liquor to Chateau Vegas and filed DOIs with the Department, attempting to identify Chateau Vegas as a Nevada importer of certain liquors, including the Bordeaux wines and French champagnes.

Chateau Vegas and Transat Trade do not have agreements with the producers of the wines and champagnes or their designated agents for the importation and sale of the products in Nevada. Indeed, several producers do not want to have a relationship with Transat Trade and do not want Chateau Vegas to import and sell their products. Transat Trade procures the wines and champagnes outside of Nevada, from sources other than Southern Wine, and provides them to Chateau Vegas for importation into Nevada.

In 2002, upon discovering that Chateau Vegas was importing and selling the French champagnes in Nevada, Southern Wine filed suit against Chateau Vegas seeking, among other things, a permanent injunction because it believed that Chateau Vegas' sales violated its exclusive trade rights under NRS Chapter 369. South-

ern Wine later amended its complaint to add Transat Trade as a defendant. Also, Southern Wine added allegations regarding Chateau Vegas' and Transat Trade's unlawful importation of the Bordeaux wines and asserted that those sales violated its exclusive trade rights under NRS Chapter 369. Southern Wine further alleged that Chateau Vegas' and Transat Trade's importation and sale of the French champagnes was in violation of its exclusive franchise rights under NRS Chapter 597.

The case proceeded to trial, with the district court bifurcating it into two phases—a bench trial to consider the equitable relief sought by Southern Wine (phase one) and a jury trial to consider the legal relief sought by Southern Wine (phase two). The bench trial on phase one was held; however, the case has not yet proceeded to phase two. The district court found that Southern Wine demonstrated the necessary requirements for permanent injunctive relief, and therefore, it permanently enjoined Chateau Vegas and Transat Trade from further importing and selling the Bordeaux wines and French champagnes. The court limited the scope of the injunction, however, noting that Chateau Vegas and Transat Trade were not precluded from importing the wines into Nevada if not otherwise contrary to law. Chateau Vegas and Transat Trade now appeal; we affirm.

## DISCUSSION

*The district court did not abuse its discretion in permanently enjoining Transat Trade and Chateau Vegas from importing and selling the Bordeaux wines*

Chateau Vegas argues that the district court abused its discretion when it permanently enjoined Chateau Vegas from importing and selling the Bordeaux wines because there was no basis for the restriction. More specifically, Chateau Vegas contends that NRS 369.386, which sets forth prerequisites for obtaining exclusive trade rights with respect to liquor, provided no basis for injunctive relief because Southern Wine failed to strictly comply with the statute's requirements.

### Standard of review

We review a district court's decision to grant a permanent injunction for an abuse of discretion. *Commission on Ethics v. Hardy*, 125 Nev. 285, 291, 212 P.3d 1098, 1103 (2009). Broadly speaking, an injunction may issue to restrain a wrongful act that gives rise to a cause of action. *State Farm Mut. Auto. Ins. v. Jafbros Inc.*, 109 Nev. 926, 928, 860 P.2d 176, 178 (1993). Permanent injunctive relief may only be granted if there is no adequate

remedy at law, a balancing of equities favors the moving party, and success on the merits is demonstrated. *Id.* "[Q]uestions of statutory construction, including the meaning and scope of a statute, are questions of law, which this court reviews de novo." *City of Reno v. Reno Gazette-Journal,* 119 Nev. 55, 58, 63 P.3d 1147, 1148 (2003). A district court's findings of fact are accorded deference, however, unless they are "clearly erroneous and not based on substantial evidence." *Beverly Enterprises v. Globe Land Corp.,* 90 Nev. 363, 365, 526 P.2d 1179, 1180 (1974).

### Exclusive rights under NRS Chapter 369

Chateau Vegas asserts that Southern Wine failed to strictly comply with the requirements of NRS 369.386 and therefore its exclusive rights to trade in the Bordeaux wines never vested. In particular, Chateau Vegas argues that Southern Wine failed to comply with the requirements of NRS 369.386 because (1) none of the châteaux filed DOIs and (2) none of the négociants filed DOAs with the Department. Chateau Vegas contends that because Southern Wine's exclusive rights had not vested, Chateau Vegas' actions did not result in any wrongdoing and therefore there was no basis for the district court to grant injunctive relief.

### Definitions and overview of NRS Chapter 369

NRS Chapter 369 implements a three-tier framework for regulating the importation, distribution, and sale of alcohol. This statutory framework generally requires strict independence between the three tiers and sets forth various restrictions on a party's activities, depending upon which tier the party falls within. *See* NRS 369.382; NRS 369.470.

The first tier is comprised of suppliers. NRS 369.111. For alcohol produced outside of the United States—the type involved in this case—a supplier is (1) the "manufacturer, producer, . . . or bottler of the liquor," (2) "his or her designated agent," or (3) the party who first owns the liquor when it is transported into the United States, if the producer "has not designated an importer to import the liquor into [Nevada]." NRS 369.111(1).

The second tier consists of importers and wholesalers. NRS 369.030; NRS 369.130. An importer is the party "first in possession [of liquor produced outside Nevada] within the State after completion of the act of importation." NRS 369.030. A wholesaler is defined as "a person licensed to sell liquor as it is originally packaged to retail liquor stores or to another licensed wholesaler, but not to sell to the consumer or general public." NRS 369.130.

The third tier is comprised of retail liquor stores, which are defined as establishments that sell liquor to consumers. NRS 369.090.

*NRS 369.386 and NRS 369.486*

"Our objective in construing statutes is to give effect to the legislature's intent." *Salas v. Allstate Rent-A-Car, Inc.*, 116 Nev. 1165, 1168, 14 P.3d 511, 513 (2000). "When a statute is clear and unambiguous, we give effect to the plain and ordinary meaning of the words and do not resort to the rules of construction." *Cromer v. Wilson*, 126 Nev. 106, 109, 225 P.3d 788, 790 (2010).

NRS 369.386 provides:

1. . . . [A] supplier of liquor may sell to an importer or wholesaler in this State *only if*:

(a) Their commercial relationship is of definite duration or continuing indefinite duration; and

(b) The importer is granted the right to offer, sell and distribute within this State or any designated area thereof such of the supplier's brands of packaged malt beverages, distilled spirits and wines, or all of them, as may be specified.

2. The supplier shall file with the Department a written notice indicating the name and address of each designated importer. Each importer shall file with the Department a written acceptance of the designation.

3. A brewer, distiller, manufacturer, producer, vintner or bottler of liquor who designates an agent to sell his or her products to importers into this State shall file with the Department a written designation indicating the name and address of the agent, and the agent shall file with the Department a written acceptance of the designation.

(Emphasis added.)

NRS 369.486(1) in turn states:

A wholesaler who is not the importer designated by the supplier pursuant to NRS 369.386 may purchase liquor *only from*:

(a) The importer designated by the supplier pursuant to NRS 369.386 to import that liquor; or

(b) A wholesaler who purchased the liquor from the importer designated by the supplier pursuant to NRS 369.386 to import that liquor.

(Emphasis added.)

NRS 369.486(1) therefore grants exclusive rights to an "importer designated by the supplier pursuant to NRS 369.386" and provides that an undesignated importer must purchase liquor from a designated importer that has complied with the relevant provisions of NRS 369.386; if the undesignated importer fails to do so, it is a violation of NRS 369.486. In order to give an importer the exclusive right to sell the supplier's brand of liquor, under

NRS 369.386(1), the supplier and the importer must have a "commercial relationship . . . of definite duration or continuing indefinite duration," and the supplier must grant the importer the right to "offer, sell and distribute" its brands of liquor within Nevada. The supplier must then designate the importer with the Department, by filing a DOI, pursuant to the provisions of NRS 369.386(2). The importer must also file acceptance of this designation in writing with the Department under NRS 369.386(2). In addition, a producer that designates an agent to sell its products to importers in Nevada must designate that agent with the Department, by filing a DOA, pursuant to NRS 369.386(3). NRS 369.386(3) also requires the agent to file a written acceptance of the designation with the Department.

We now turn to the central question of whether Southern Wine complied with NRS 369.386. The châteaux each executed exclusive agreements with Southern Wine. Each agreement read: "Supplier grants to Southern Wine . . . the exclusive right to import the Products into the State of Nevada and sell and/or distribute the Products within the State." Moreover, each of the agreements stated a definite effective period of five years, and all of the agreements were in effect at the time the district court granted the permanent injunction. Southern Wine therefore complied with NRS 369.386(1).

Next, each of the châteaux, through the négociants, filed DOIs with the Department, and Southern Wine accepted the designations when it signed and dated each of the DOIs submitted to the Department. Although the agreements between Southern Wine and the châteaux did not explicitly list the négociants as agents, the châteaux and the négociants clearly contemplated an agency relationship. Under NRS 369.111, a supplier's designated agent may act on behalf of its supplier for purposes of NRS Chapter 369, and therefore, contrary to Chateau Vegas' suggestion, it is irrelevant that the châteaux themselves did not file DOIs; thus, Southern Wine complied with NRS 369.386(2).

The more significant issue before us is whether Southern Wine complied with NRS 369.386(3), which requires a liquor producer acting through an agent to file a "written designation" and the agent to file a "written acceptance" of the producer's designation. Crucially, NRS 369.386(3) does not specify a filing procedure for a DOA and an acceptance thereof or mandate that they be filed in a particular form. Rather, by its plain language, the statute simply states, in broad terms, that a "written designation" and "written acceptance" must be filed. The agreements between Southern Wine and the châteaux each provided that the châteaux themselves would not provide the wines to Southern Wine; rather, the châteaux' négociants would provide the wines to Southern Wine.

Again, while these agreements did not explicitly list the négociants as agents, the châteaux and the négociants clearly contemplated an agency relationship. These agreements were filed with the Department. In light of the broad language employed in NRS 369.386(3), these agreements qualify as written designations of the producers' agents. Likewise, the agents' filing of the DOIs for the châteaux qualifies as written acceptance of the designations. Requiring a different filing procedure or form for a DOA and an acceptance would read additional requirements into NRS 369.386(3), which we must not do. *See Szydel v. Markman*, 121 Nev. 453, 457, 117 P.3d 200, 202 (2005) ("When the language of a statute is clear on its face, this court will deduce the legislative intent from the words used."). We therefore conclude that the filing of the agreements and the DOIs satisfied the requirements of NRS 369.386(3). As such, Southern Wine established exclusive trade rights under NRS 369.386 and, pursuant to NRS 369.486, Chateau Vegas was required to purchase the Bordeaux wines from Southern Wine.[7]

### *Infringement of Southern Wine's exclusive trade rights*

Substantial evidence supports the district court's finding that Chateau Vegas was importing and selling the Bordeaux wines in violation of Southern Wine's exclusive rights. Transat Trade was obtaining the wines from sources other than Southern Wine and providing them to Chateau Vegas for sale in Nevada, in an attempt to circumvent NRS 369.486's proscription of an undesignated importer's purchase of alcohol from any source other than the importer designated by the liquor producer. Because the châteaux had already designated an importer—Southern Wine—Transat Trade cannot be considered a supplier for purposes of NRS Chapter 369 and therefore could not effectively grant Chateau Vegas exclusive rights. *See* NRS 369.111 (defining "supplier" as "[t]he owner of the liquor when it is first transported into any area under the jurisdiction of the United States Government, *if the . . . producer . . . has not designated an importer to import the liquor into this State*" (emphasis added)).

The record shows that Southern Wine invested heavily in the continued value of the Bordeaux wines. It built an expensive modernized facility in Las Vegas to properly store its products. Over the course of several years, Southern Wine partnered with the

---

[7]We note that the châteaux did not designate Chateau Vegas and Transat Trade as Nevada importers. Under NRS 369.386, if it wished, a supplier could conceivably designate two importers in Nevada. As long as both importers were designated, neither would then be subject to the restrictions imposed upon undesignated importers. But, because Chateau Vegas and Transat Trade were undesignated importers, they were required to purchase only from Southern Wine in order to comply with NRS 369.486.

châteaux to build and strengthen the value of the brands. It protected the reputation of the brands by making certain that counterfeited products were not sold in Nevada. It also equipped its shipping trucks with specialized equipment to ensure that the wines would be transported at proper temperatures, thus preserving the flavor and quality of the wines.

On the other hand, the record reveals that Transat Trade shipped the wines without adequate quality control measures. In fact, Transat Trade had shipped the wines in question into Nevada on vegetable trucks. The evidence produced at trial indicated that such activities could adversely affect the quality of the wines because foreign tastes could seep through the wines' corks. Due to Southern Wine's reputation as the primary Nevada importer of the Bordeaux wines, products that had been compromised reflected poorly on Southern Wine and damaged the value of its investment. Transat Trade and Chateau Vegas were thereby damaging the reputation of the Bordeaux wines and Southern Wine in a manner that remedies at law could not correct. *See Guion v. Terra Marketing of Nev., Inc.*, 90 Nev. 237, 240, 523 P.2d 847, 848 (1974) ("Equity will . . . restrain tortious acts where it is essential to preserve a business or property interests . . . . The right to carry on a lawful business without obstruction is a property right, and acts . . . which interfere with the carrying on of plaintiff's business or destroy its custom, its credit or its profits, do an irreparable injury and thus authorize the issuance of an injunction.").

We therefore conclude that Southern Wine demonstrated that there was no adequate remedy at law, the equities were in its favor, and it was successful in demonstrating the merits of its action for permanent injunctive relief. Accordingly, the district court did not abuse its discretion in permanently enjoining Chateau Vegas and Transat Trade from importing and selling the Bordeaux wines.

*The district court did not abuse its discretion in permanently enjoining Chateau Vegas and Transat Trade from importing and selling the French champagnes*

Similar to its argument with respect to the Bordeaux wines, Chateau Vegas argues that the district court abused its discretion when it enjoined Chateau Vegas from importing and selling the French champagnes because Southern Wine failed to comply with the requirements of NRS 369.386, and thus there was no basis for the injunction. Chateau Vegas next argues that the district court abused its discretion when it alternatively enjoined Chateau Vegas from importing and selling the French champagnes due to its interference with Southern Wine's liquor franchise rights under NRS Chapter 597.

*Exclusive rights under NRS Chapter 369*

Chateau Vegas asserts that Southern Wine failed to comply with the requirements of NRS 369.386 and therefore its exclusive rights to trade in the French champagnes never vested. Chateau Vegas specifically argues that Southern Wine failed to comply with NRS 369.386 because none of the champagne producers filed DOIs and the champagne producers did not file effective DOAs.

The record demonstrates that the champagne producers and Southern Wine have had a commercial relationship for 5 to 25 years and that the producers desire to continue this relationship for an indefinite duration. Southern Wine therefore complied with NRS 369.386(1). Next, the producers' designated agents filed DOIs with the Department granting Southern Wine the exclusive right to import the French champagnes into Nevada, and Southern Wine filed acceptances with the Department for each of these designations, satisfying NRS 369.386(2). Likewise, the French champagne producers designated agents to sell their champagnes in the United States and filed DOAs for each of the agents; these agents accepted the designations, thus satisfying the requirements of NRS 369.386(3). Consequently, Southern Wine obtained exclusive trade rights under NRS 369.386.

The record shows that Chateau Vegas was obtaining the French champagnes for sale in Nevada from sources other than Southern Wine. Because the champagne producers had already designated Southern Wine as the Nevada importer, Transat Trade was not a supplier for purposes of NRS Chapter 369 and therefore could not effectively grant Chateau Vegas exclusive rights. *See* NRS 369.111 (defining ''supplier'' as ''[t]he owner of the liquor when it is first transported into any area under the jurisdiction of the United States Government, *if* the . . . producer . . . has not designated an importer to import the liquor into this State'' (emphasis added)). Thus, in obtaining the French champagnes for sale in Nevada from sources other than Southern Wine, Chateau Vegas was infringing on Southern Wine's exclusive trade rights and operating in violation of NRS 369.486.

Substantial evidence supports the district court's finding that Chateau Vegas' importation and sale of the French champagnes was also causing Southern Wine irreparable harm. Transat Trade obtained the champagnes from sources other than Southern Wine, and such sources did not ensure the quality of the champagnes. Southern Wine demonstrated that if compromised or counterfeited

products are sold in Nevada, it ultimately will damage Southern Wine's reputation with the champagne producers, as well as retailers, because both will look to Southern Wine to remedy such problems. Moreover, if a customer has a bad experience due to compromised champagne, the customer may tell other consumers, who will be deterred from purchasing the champagnes. In the process, the reputation of the champagne is damaged, and Southern Wine's sales are diminished. Southern Wine thus demonstrated that Chateau Vegas was engaging in unlawful acts that gave rise to the need for injunctive relief. *See Hansen v. Edwards*, 83 Nev. 189, 191-93, 426 P.2d 792, 793-94 (1967) (affirming the issuance of permanent injunction to protect a business's goodwill from the violation of a noncompete clause); *see also Sobol v. Capital Management*, 102 Nev. 444, 446, 726 P.2d 335, 337 (1986) (competitor's usurpation of medical center's trade name created public confusion, infringed on the goodwill of the center, and damaged the center's reputation in eyes of creditors, thereby entitling the center to a preliminary injunction). We therefore conclude that the district court did not abuse its discretion in permanently enjoining Chateau Vegas and Transat Trade from importing and selling the French champagnes under NRS Chapter 369.[8]

## CONCLUSION

We conclude that the district court did not abuse its discretion in permanently enjoining Chateau Vegas and Transat Trade from importing and selling the Bordeaux wines in Nevada. We further conclude that the district court did not abuse its discretion in permanently enjoining Chateau Vegas and Transat Trade from importing and selling the French champagnes in Nevada. We therefore affirm the district court's order granting the permanent injunction.

DOUGLAS, CHERRY, GIBBONS, PICKERING, and HARDESTY, JJ., concur.

---

[8]In light of our disposition, we need not reach whether the district court abused its discretion in alternatively enjoining Chateau Vegas and Transat Trade from importing and selling the French champagnes due to its interference with Southern Wine's liquor franchise under NRS Chapter 597. Also, we have considered Chateau Vegas' remaining contentions and conclude that they are without merit.